# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LOUIS NIX                                                    CIVIL ACTION

VERSUS                                                       NO.  10-0529

N. BURL CAIN, WARDEN                                         SECTION "A"(2)


## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

# I.    STATE COURT PROCEDURAL BACKGROUND

The petitioner, Louis Nix, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] Nix was indicted by a grand jury in Orleans Parish on July 5, 2006, and charged with the second degree murder of Gary McGlothen and the attempted second degree murder of Carl Jiminez.[3] The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case in relevant part as follows:

> Nicole Gibson testified that on March 29, 2006 she lived in an apartment on Garden Oaks Drive in the Jackson Landing Apartments. She testified that sometime after 10:00 p.m., a friend called to say he was coming to visit. She stated that because her friend had not been to her apartment before, she went outside to wait for him, taking her cell phone with her. She waited outside about twenty minutes when her friend called around 10:35 p.m. to tell her that he was in the parking lot. A car was parked nearby, and she thought her friend might be in it, playing a trick on her. She walked up to the car, which had the passenger window down. She could see a man in the passenger seat, and later identified the man as the defendant Louis Nix. Another man was in the driver's seat. She testified that when she discovered that she had gone to the wrong vehicle, she quickly apologized and backed away because she was wearing her "night clothes." She testified that the passenger told her it was all right.
> 
> Ms. Gibson testified that she then saw her friend's truck on the other side of the parking lot, and she walked over to meet him. She testified that the car containing Nix and the other man was not parked in a parking place, but was merely stopped in the parking lot, and it was partially blocking her car. She testified that as she and her friend began walking back to her apartment, she saw the brake lights of the car go on. Ms. Gibson testified that she said in a very loud voice as they passed the car that she would be late to work again in the morning because people were always blocking her car. She testified that she looked over at the car and noticed that the passenger window was now closed and that the passenger had departed. She and her friend went into her apartment. She stated that when her friend left sometime between 12:30 and 1:00 the next morning, the car was still there, but she did not go outside at that time. Later that morning, when she left her apartment to go to work, Ms. Gibson noticed that the car was still in the same place. She testified that she walked

---

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 4, Indictment, 7/5/06; Grand Jury Return, 7/5/06.

up to the car and yelled to the man sitting in the driver's seat to move the car. She testified that she looked inside the car and found the victim sitting in the passenger seat with a knife in his eye. She ran back to her apartment and asked her roommate and her cousin to call 911.

Ms. Gibson testified that on April 6, 2006, she viewed a photographic lineup from which she chose Nix's picture as being the man in the passenger seat of the car in the parking lot. She testified that she was able to see the passenger clearly because of lighting that shone on the car from the apartment complex. Ms. Gibson also identified Nix in court as the man who she saw in the passenger side of the car. She testified that she did not know Nix prior to the incident.

[. . .]

Archie Kaiser testified that McGlothen was his roommate and his best friend. He stated that a few days before the murder he and McGlothen met Nix through mutual friends in New Iberia. He stated that he and McGlothen drove Nix back to New Orleans, and although Nix was supposed to stay with relatives, he asked if he could stay with Kaiser and McGlothen at their residence in Terrytown. Kaiser testified that Nix stayed with them a few days, and some sort of relationship developed between Nix and McGlothen. Kaiser stated that on March 29, the three men returned to New Iberia so that Nix could pick up a paycheck, and then they drove back to New Orleans, arriving at approximately 9:30 p.m. He testified that McGlothen asked to borrow his car, but the car was out of gas, so McGlothen and Nix left together in McGlothen's car. McGlothen told Kaiser that he would return shortly. Kaiser testified that he called McGlothen at approximately 10:10, and at that time he could hear Nix's voice in the background. Kaiser testified that he tried to call McGlothen at approximately 10:45, but McGlothen did not answer his cell phone. McGlothen did not return home.

Kaiser testified that he spoke with detectives the next morning concerning McGlothen's murder. Some time later, he viewed a photographic lineup from which he chose Nix's photo. Kaiser testified that Edward Turner was also staying at his residence during part of the time that Nix was staying there, but he insisted that Turner left town a few days before the murder. He stated that Turner previously knew Nix. On cross-examination, Kaiser admitted that he and Turner had been lovers for several years in the past. On redirect, Kaiser testified that Nix never returned to his residence or contacted him after leaving with McGlothen on the night of the murder.

Edward Turner testified that he knew Nix, Kaiser, and McGlothen. He testified that he saw Nix at Kaiser's home on the day before the murder. At that time, he and Kaiser argued. Turner testified that Nix was upset that day, and Nix told him that he knew that McGlothen had $10,000 in his bank account and that Nix knew the personal identification number for the account. Turner testified that Nix told him that he wanted to kill McGlothen in order to get the money out of the account. Turner testified that he responded that he wanted no part of Nix's plan. Turner stated that he did not speak with Nix again after this conversation, and he insisted that he was in California at the time of the murder.

On cross-examination, Turner testified that Kaiser and McGlothen were romantically involved. Turner testified that he went with Kaiser and McGlothen to New Iberia to pick up Nix. He admitted that he did not inform the police about Nix's plan to kill McGlothen for his money. He also admitted that he had prior convictions for solicitation and purse snatching.

[. . .]

On the second day of trial, the State presented evidence concerning the attempted murder of Carl Jiminez. Detective Daniel Lohman testified that on April 22, 2006, he received a call of an aggravated battery by stabbing occurring at 103 Brunswick Court. Detective Lohman testified that several days later he interviewed Jiminez at that address. He testified that he showed Jiminez a photographic lineup from which Jiminez chose Nix's photo as the man who stabbed him.

Carl Jiminez testified that at the time of the stabbing he lived with Derrick Hatcher at the Brunswick Court address. Jiminez testified that shortly before the stabbing, Hatcher brought Nix home and asked if Nix could stay there temporarily. Jiminez replied that Nix could stay in the FEMA trailer parked in the front yard of the residence. Jiminez testified that on April 22, Nix went with him to pick up his truck from the mechanic shop, and the two drove back to the residence. He allowed Nix to come inside the residence to watch television. Nix asked him if he could borrow $80 to take his girlfriend to a club, and Jiminez declined the request. . . .

* * *

Jiminez testified that at approximately 11:30 p.m., he was sleeping when Nix entered his room and called to him. Nix then stabbed him above his right eye. He stated that Nix continued stabbing him in his right upper arm, his right lower arm, and the left side of the top of his chest. Jiminez testified that he rolled off of the bed, and Nix told him to give him his money, wallet, and keys. Jiminez threw his wallet through the door into the living room, and when Nix went to get it, he closed and locked the bedroom door. Jiminez heard the front door open. He looked out his bedroom window, and saw Nix out in the front of the house. Jiminez then went into the living room, locked the front door, and went into the kitchen to call for help. While he was trying to summon help, he heard the front door open, and he saw Nix reenter the residence, using Hatcher's keys. Jiminez stated that Nix told him that he could not use Hatcher's car because the battery was dead, and he wanted the keys to Jiminez' truck. Jiminez testified that he picked up a small table and used it as a shield against Nix. Nix waved the knife at him and then threw the knife and ran out the door. Jiminez testified that he picked up an umbrella and gave chase, yelling for someone to call the police. However, Nix escaped.

Jiminez testified that the knife that Nix used to stab him came from the FEMA trailer. Jiminez described his various wounds, including one that went to his bone and was still numb at the time of trial. He testified that one stab wound broke his collar bone, and the wounds to his chest and forearm bled profusely. He testified that he later met with police officers who showed him a photographic lineup from which he chose Nix's photo as the man who stabbed him. He also identified

4

photographs taken at his residence that showed blood in several rooms. On cross-examination, Jiminez denied that he and Hatcher were lovers, describing them as merely roommates. He denied having a knife that night.

Louis Nix denied stabbing either Jiminez or McGlothen. He testified that he met Jiminez through Hatcher, and he testified that he stayed with them inside their residence, not in the FEMA trailer in the yard. He testified that on April 22, he was watching television inside the residence when Jiminez and Hatcher left. He testified that Jiminez returned alone, telling him that Hatcher had been arrested and that he was going to bail him out the next day. Nix testified that Jiminez began pacing around the living room, and then he sat down next to Nix. Nix stated that Jiminez appeared to be under the influence of something. Nix stated that Jiminez then put his arm around the back of Nix's chair, and Nix told him to move his arm. Nix stated that Jiminez complied, but he soon put his arm back around the chair and offered Nix money in exchange for sex. Nix testified that he replied that he had a girlfriend and did not mess around with men. Nix testified that Jiminez repeatedly offered him money, which Nix repeatedly refused. Nix stated that Jiminez then got upset and yelled at Nix to leave. Nix stated that he refused to do so because he had paid Jiminez money to stay at the residence. Nix testified that Jiminez then went into the kitchen and came back with a knife. Nix testified that he flipped over a table and agreed to leave. He stated that Jiminez then charged at him as he came around the table, and Nix picked up the table. Nix testified that Jiminez then fell and dropped the knife. Nix stated that he picked up the knife and stabbed Jiminez an unknown number of times, then dropped the knife and ran from the residence. He admitted that he did not call the police about the incident. He also admitted that he had prior convictions for simple robbery and battery.

On cross-examination, Nix denied asking Jiminez for money or asking him to take him and his girlfriend to a club. He testified that he did not leave the residence when Jiminez first asked him to have sex because he had nowhere to go. He testified that after Jiminez dropped the knife, he picked it up, but then dropped it as he began walking out of the residence. He stated that Jiminez then picked up the knife again and cut him on his hand. The two men wrestled, and Jiminez again dropped the knife. Nix stated that he picked up the knife a second time and stabbed Jiminez. He then dropped the knife and left, and as he was leaving he saw Jiminez getting up from the floor. He insisted that he stabbed Jiminez because of "sexual activities."

With respect to McGlothen's murder, on direct examination Nix testified that he met him through friends in New Iberia. He stated that he came to New Orleans with McGlothen and stayed at his house. He testified that he knew Turner, but he denied telling Turner about McGlothen's bank account or his intent to kill McGlothen; he insisted that he did not know the personal identification number for the account. He testified that McGlothen had loaned him a ring, which he then pawned to his cousin who lived in the apartment complex on Garden Oaks Drive. He testified that the last time he saw McGlothen was when he left McGlothen in his car in the parking lot of the complex. He testified that he left McGlothen's car to go

to his cousin's apartment to retrieve the ring, but his cousin told him that he had sold the ring to someone else. Nix testified that he did not want to face McGlothen with the news, so he left the apartment and did not return to McGlothen's car. He insisted that he did not see McGlothen again after he left the car. He admitted that he was hiding when the police arrested him at his stepfather's apartment, but he maintained that he did not know McGlothen was dead and that his girlfriend had merely told him that the police were looking for him in connection with a murder.

On cross-examination, Nix testified that he lived with McGlothen and Kaiser for approximately two weeks. He stated that Turner was also staying there at the time. He denied having a relationship with McGlothen and explained that McGlothen had given him the ring because he had admired it. He stated that he gave his cousin the ring because he owed his cousin money for drugs. He denied killing McGlothen to get money to pay back his cousin, and he denied knowing McGlothen had a debit card. He testified that McGlothen drove him to his cousin's apartment to get the ring, but when he learned that his cousin had sold the ring, he left with his cousin instead of returning to McGlothen's car. He denied having any conversations with Ms. Gibson while he was sitting in the car with McGlothen prior to going to his cousin's apartment. He admitted that he did not return to McGlothen's residence to retrieve his belongings, but he denied knowing that McGlothen had been murdered.

State v. Nix, 987 So.2d 855, 856-61 (La. App. 4th Cir. 2008); State Record Volume 2 of 4, Louisiana Fourth Circuit Opinion, 2007-KA-1431, pages 1-10, June 18, 2008.

On August 2 and 28, 2006, the state trial court heard testimony and argument on the defense motion to suppress the identifications made by Hatcher and Gibson.[4] The court denied the motion.[5]

---

[4]St. Rec. Vol. 1 of 4, Hearing Minutes, 8/2/06; Hearing Minutes, 8/28/06.

[5]St. Rec. Vol. 1 of 4, Hearing Minutes, 8/28/06.

On December 1, 2006, Nix's appointed defense counsel orally moved for the court to conduct a lunacy hearing.[6] The state trial court held a hearing on December 14, 2006, and found Nix competent to stand trial.[7]

Thereafter, on January 12, 2007, defense counsel filed a motion to sever the counts for trial.[8] At a hearing held January 24, 2007, the court denied that motion.[9]

Nix was tried before a jury on January 29 and 30, 2007, and found guilty of manslaughter as a lesser included offense on the first count and guilty as charged on the second count of attempted second degree murder.[10] The state trial court sentenced Nix on April 27, 2007, to serve 40 years in prison for manslaughter, without benefit of probation or suspension of sentence, and to serve 50 years in prison for attempted second degree murder, consecutively to the other sentence and without benefit of parole,

---

[6]St. Rec. Vol. 1 of 4, Minute Entry, 12/1/06.

[7]St. Rec. Vol. 1 of 4, Hearing Minutes,12/14/06; St. Rec. Vol. 2 of 4, Sanity Commission Evaluation, 6/26/07. There is no explanation for the 2007 date appearing on the commission's report. It appears simply to be a clerical or typographical error.

[8]St. Rec. Vol. 1 of 4, Motion to Sever Counts, 1/12/07; Minute Entry, 1/12/07.

[9]St. Rec. Vol. 1 of 4, Minute Entry, 1/24/07; St. Rec. Vol. 2 of 4, Hearing Transcript, 1/24/07.

[10]St. Rec. Vol. 1 of 4, Trial Minutes (2 pages), 1/29/07; Trial Minutes (2 pages), 1/30/07; St. Rec. Vol. 3 of 4, Trial Transcript, 1/29/07; Trial Transcript, 1/30/07.

probation, or suspension of sentence.[11] The court also denied Nix's motion to reconsider the sentence.[12]

On direct appeal, Nix's appointed counsel raised five assignments of error: (1) The trial court erred in denying the motion to sever the counts. (2) The evidence was insufficient to prove the manslaughter of McGlothen. (3) The evidence was insufficient to prove attempted second degree murder of Jiminez. (4) The trial court erred in admitting photographs of McGlothen. (5) The sentence was excessive.[13]  On June 18, 2008, the Louisiana Fourth Circuit affirmed Nix's convictions and sentences, finding no merit in his claims.[14]

Nix's convictions became final 30 days later, on July 18, 2008, because he did not seek rehearing or file for timely review in the Louisiana Supreme Court.[15] Butler v. Cain, 533 F.3d 314 (5th Cir. 2008) (citing Roberts v. Cockrell, 319 F.3d 690, 694-95 (5th Cir. 2003)) (an appeal is final when the state defendant does not timely proceed to the next available step in an appeal process)); Wilson v. Cain, 564 F.3d 702 (5th Cir. 2009)

---

[11]St. Rec. Vol. 1 of 4, Sentencing Minutes, 4/27/07; Minute Entry, 2/6/07; Pre-sentence Investigation Report, 4/12/07; St. Rec. Vol. 3 of 4, Sentencing Transcript, 4/27/07.

[12]Id.; St. Rec. Vol. 1 of 4, Motion to Reconsider Sentence, 4/27/07.

[13]St. Rec. Vol. 3 of 4, Appeal Brief, 2007-KA-1431, 11/27/07.

[14]State v. Nix, 987 So.2d at 855; St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 2007-KA-1431, 6/18/08.

[15]Pursuant to La. S. Ct. R. X§5, petitioner had 30 days from the issuance of the state appellate court's opinion to mail or file a timely writ application in the Louisiana Supreme Court, which he did not do as noted later.

(timely filed motion for rehearing must be considered in determining the finality of a conviction).

Three months later, on September 19, 2008, Nix mailed a writ application to the Louisiana Supreme Court seeking review of that order.[16]  The Louisiana Supreme Court, on August 12, 2009, denied Nix's writ application without stated reasons.[17]

## II.    FEDERAL HABEAS PETITION

On February 18, 2010, the clerk of this court filed Nix's petition for federal habeas corpus relief, in which he raises the following grounds for relief:[18] (1) The trial court erred in denying the motion to sever the counts. (2) The evidence was insufficient to prove the manslaughter of McGlothen. (3) The evidence was insufficient to prove attempted second degree murder of Jiminez. (4) The trial court erred in admitting photographs of McGlothen. (5) The sentence was excessive.

The State filed a response in opposition to Nix's petition arguing that his claims are without merit.[19]

---

[16]St. Rec. Vol. 4 of 4, La. S. Ct. Writ Application, 08-KH-2459, 10/13/08 (postmarked 9/19/08). Nix's signature on the copies of the pleadings is not dated.  The only submission date appearing in this record is the postmark date, which was after the 30-day period allowed for seeking review in the Louisiana Supreme Court under La. S. Ct. R. X§5.

[17]State ex rel. Nix v. State, 17 So.3d 367 (La. 2009); St. Rec. Vol. 4 of 4, La. S. Ct. Order, 2008-KH-2459, 8/12/09.

[18]Rec. Doc. No. 1.

[19]Rec. Doc. No. 12.

III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L.

No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation,

including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[20] and

applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198

(5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore

applies to Nix's petition, which, for reasons discussed below, is deemed filed in this

federal court on December 31, 2009.[21]

The threshold questions in habeas review under the amended statute are whether

the petition is timely and whether the claims raised by the petitioner were adjudicated on

the merits in state court; i.e., the petitioner must have exhausted state court remedies and

must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20

---

[20]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[21]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995).  Nix's petition was filed by the clerk of this court on February 18, 2010, when the filing fee was paid.  Nix's signature on the petition is dated December 31, 2009.  This is the earliest date on which he could have delivered the pleadings to prison officials for mailing.  The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition.  See Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

(5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  In this case, the State concedes exhaustion and suggests that Nix's petition is timely.[22]

IV.  STANDARDS OF A MERITS REVIEW

Amended 28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly

---

[22]I disagree with the State's timeliness analysis, because the State fails to address the untimely Louisiana Supreme Court petition.  See Butler v. Cain, 533 F.3d at 317.  Under federal habeas corpus law, the untimely filing is not considered in the finality or tolling calculation.  Id., at 319 (La. S. Ct. R. X§5(a) forbids any extension of time); Williams v. Cain, 217 F.3d at 309-11 (same).  I will nevertheless address the merits of the claims.

established [Supreme Court precedent.]'" Penry v. Johnson, 215 F.3d 504, 507 (5th Cir.

2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S.

849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210

F.3d at 485. The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts. Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000); Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485. "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  <u>Price</u>, 538 U.S. at 641 (quoting <u>Woodford</u>, 537 U.S. at 24-25); <u>Wright v. Quarterman</u>, 470 F.3d 581, 585 (5th Cir. 2006).

V.      <u>DENIAL OF MOTION TO SEVER COUNTS (CLAIM NO. 1)</u>

Nix alleges that the state trial court erred in denying the motion to sever the counts against him because of the prejudicial effect it had on the trial and jury.  He argues that the evidence was confusing.  He further contends that the nature of the crimes were independent and unrelated, and the joint trial misled the jury to find guilt by implication.

As an initial matter, to the extent Nix is arguing that the state trial court erred as a matter of state law in denying the severance he has failed to state a cognizable claim. A federal habeas court does not sit to correct errors made by state courts in interpreting and applying state law.  <u>Narvaiz v. Johnson</u>, 134 F.3d 688, 695 (5th Cir. 1998) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) and <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990), and citing <u>West v. Johnson</u>, 92 F.3d 1385, 1404 (5th Cir. 1996)); <u>accord</u> <u>Turner v. Johnson</u> , 46 F. Supp.2d 655, 674 (S.D. Tex. 1999).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle</u>, 502 U.S. at 67-68; <u>see also</u>, <u>Molo v. Johnson</u>, 207 F.3d 773, 776 n.9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); <u>Hogue v. Johnson</u>, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).  The state courts' application and interpretation of Louisiana laws on severance are not bases for federal habeas corpus relief.

Instead, federal habeas courts sit only to address violations of a constitutional magnitude and where the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair. Lisenba v. People of the State of California, 314 U.S. 219, 236-37 (1941); Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.) An alleged denial of due process based on undisputed facts presents a question of law. Richardson v. Quarterman, 537 F.3d 466, 472 (5th Cir.2008). This court must determine if the state court's decision to deny the severance motion was contrary to, or involved an unreasonable application of, Supreme Court precedent concerning petitioner's due process rights.

It is a settled premise that "[s]everance is within the discretion of the trial court and is required only in cases of compelling prejudice." Breeland v. Blackburn, 786 F.2d 1239, 1241 (5th Cir. 1986) (citing United States v. MacIntosh, 655 F.2d 80, 84 (5th Cir. 1981)). When reviewing the denial of a motion to sever on habeas review, the simultaneous trial of more than one offense must have rendered the state trial fundamentally unfair before a petitioner can obtain federal habeas relief. Alvarez v. Wainwright, 607 F.2d 683, 685 (5th Cir. 2003) (quoting Triblett v. Wainwright, 540 F.2d 840, 841 (5th Cir. 1976)). "The burden of demonstrating prejudice is a difficult one, and

the ruling of the trial judge will rarely be disturbed by a reviewing court." <u>Breeland</u>, 786 F.2d at 1241 (citation omitted).

In this case, Louisiana law provides for the joinder of criminal acts in one bill of information or indictment:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

La. Code Crim. P. art. 493.

In addition, La. Code Crim. P. art. 493.2 also permits joinder where "offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." However, La. Code Crim. P. art. 495.1, provides that "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."

Thus, under both state and federal law, Nix is only entitled to relief if he can establish that the presentation of the charges together at trial prejudiced his defense. Nix has not established prejudice or that the joinder of the two crimes for trial was inappropriate.

The trial transcript reflects that the State focused its case on the McGlothen murder on the first day of trial.[23] On the second day, the State concentrated on the evidence and testimony related to the attempted murder of Jiminez.[24] The record demonstrates that the State presented the crimes as two separate occurrences with distinct testimony and evidence of each crime. In addition, both crimes were punishable at hard labor under Louisiana law. The crimes were similar in character, both involving a knife as the weapon and both involving stab wounds in or about the eye. The witnesses involved in each crime separately identified Nix, unrelated to the other crime, and there were witnesses for each crime who knew Nix personally.

A reasonable jury would not have been confused by the presentation of the evidence against Nix. The record is devoid of anything that would reflect the possibility

---

[23]St. Rec. Vol. 3 of 4, Trial Transcript, p. 2, 1/29/07. The witnesses testifying that day were the coroner, the witness who saw Nix and McGlothen together in a vehicle, McGlothen's roommate, and police personnel involved in that investigation.

[24]St. Rec. Vol. 3 of 4, Trial Transcript, p. 2, 1/30/07. The witnesses testifying that day were the investigating officer and Jiminez himself.

that his trial was so fundamentally unfair that his due process rights were violated.  Nix has failed to establish a due process violation arising out of the joint trial.

To the extent Nix suggests that the joint trial impinged upon his Fifth Amendment right to remain silent, his argument is unpersuasive.  Nix chose to testify in order to assert (beyond counsel's questioning of Jiminez) his self-defense theory to the jury on the attempted murder charge.  He claims, however, that he did not intend to testify with regard to the McGlothen murder.

"'Where joinder is proper and there has been found no substantial prejudicial effect, the Fifth Amendment is not violated because a defendant must elect to testify as to both charges or to none at all.'"  Alvarez, 607 F.2d at 685 n.2 (quoting Holmes v. Gray, 526 F.2d 622, 626 (7th Cir. 1975)); see also, Williams v. Fla., 399 U.S. 78, 83-84 (1970) ("The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction . . . That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.")

As noted by the state appellate court, his decision to testify did not cause Nix to implicate himself in the McGlothen murder in violation of his right to remain silent.  Nix instead testified that he left McGlothen alive in the car after he was unsuccessful in

getting the ring back from his cousin.[25]  This testimony was not prejudicial to his defense. Nix's Fifth Amendment conflict argument is without merit.

In sum, the record does not reveal the possibility of confusion in the presentation of the evidence, and Nix has failed to demonstrate prejudice in the presentation of the charges in a joint trial.  Nix has not shown constitutional error in the trial of the charges together and, more importantly, has failed to demonstrate fundamental unfairness arising from the joinder of these two matters for trial.

The state courts' denial of relief on Nix's claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Nix is not entitled to relief on these claims.

## VI.    INSUFFICIENT EVIDENCE (CLAIM NOS. 2 AND 3)

Nix alleges that the evidence was insufficient to support the convictions.  He alleges that the circumstantial evidence regarding the McGlothen murder failed to negate every reasonable possibility of misidentification and prove that he committed the murder. He further argues that the State failed to prove that he specifically intended to kill, or cause great bodily harm to, Jiminez to support the attempted second degree murder conviction.

---

[25]St. Rec. Vol. 3 of 4, Trial Transcript, p. 56, 1/30/07.

These arguments were asserted on direct appeal in the Louisiana Fourth Circuit and were denied as meritless. Relying on state case law, based on the well-established standard of Jackson v. Virginia, 443 U.S. 307 (1979), the court considered the evidence, in a light most favorable to the prosecution, and resolved that the evidence was sufficient to support the verdicts.

Under Jackson, the court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. Jackson, 443 U.S. at 319; Gilley v. Collins, 968 F.2d 465, 467 (5th Cir. 1992); Guzman v. Lensing, 934 F.2d 80, 82 (5th Cir. 1991). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. Alexander v. McCotter, 775 F.2d 595, 597-98 (5th Cir. 1985); Turner v. McKaskle, 775 F.2d 999, 1001 (5th Cir. 1983). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. Guzman, 934 F.2d at 82 (citing Tyler v. Phelps, 643 F.2d 1095, 1102 (5th Cir. 1981)).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, as those determinations are the exclusive province of the jury. United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see also

Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). Thus, all credibility choices and conflicting inferences are to be resolved in favor of the verdict. Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005). The reviewing court is not authorized to substitute its interpretation of the evidence for that of the fact-finder. Alexander, 775 F.2d at 598.

A claim of insufficient evidence presents a mixed question of law and fact. Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995). Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

A. Manslaughter of McGlothen

Though indicted for the second degree murder of McGlothen, the jury found Nix guilty of the lesser offense of manslaughter.[26] Louisiana law defines manslaughter, in relevant part, as follows:[27]

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an

---

[26]Under Louisiana law, manslaughter is a legislatively authorized responsive verdict for a charge of second degree murder. La. Code Crim. P. art. 814(A)(3).

[27]The relevant portion of the statute was determined based on the charge given to the jury by the state trial court. St. Rec. Vol. 3 of 4, Trial Transcript, p. 88-89, 1/30/07.

average person's blood would have cooled, at the time the offense was
committed . . .

La. Rev. Stat. Ann. §14:31(A)(1).

In this case, Nix does not challenge the sufficiency of the evidence proving that

the homicide occurred.  Instead, he challenges the sufficiency of the evidence necessary

to establish that <u>he</u> stabbed McGlothen in the eye, which was the fatal wound.  He argues

that the evidence identifying him as the perpetrator was purely circumstantial and not

enough to establish him to be the murderer.  He contends that the Louisiana law on

circumstantial evidence requires that the evidence exclude every possibility that he was

innocent, and that the evidence in his case does not meet that burden.

Under Louisiana law, in addition to proving the statutory elements of the charged

offense at trial, the State is required to prove a defendant's identity as the perpetrator.

<u>State v. Draughn</u>, 950 So.2d 583, 593 (La.), <u>cert. denied</u>, 552 U.S. 1012 (2007); <u>State v.

Ingram</u>, 888 So.2d 923, 926 (La. App. 5th Cir. 2004).  Where the key issue is

identification, the State is required to negate any reasonable probability of

misidentification.  <u>Id</u>.  In addition, in Louisiana, "[t]he rule as to circumstantial evidence

is:  assuming every fact to be proved that the evidence tends to prove, in order to convict,

it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. Ann. § 15:438.

On federal habeas corpus review, however, the court does not apply these state law

"reasonable hypothesis" standards, but must apply the federal standard announced in

<u>Jackson</u> in a manner consistent with the AEDPA standard of review set forth above.[28]

<u>Gilley</u>, 968 F.2d at 467 (citing <u>Schrader v. Whitley</u>, 904 F.2d 282, 284 (5th Cir. 1990)).

In applying the appropriate standard, I have reviewed the transcript and find the evidence of the crime and of the identification sufficient to support the verdict. The forensic pathologist, Dr. Dana Troxclair, testified that, when she conducted the autopsy, McGlothen still had a knife stuck in his left eye.[29] This was the fatal wound, because the knife pierced the eye, the skull bone, the left portion of the brain, and then crossed the mid-line into the right side of the brain. The point of the knife then lodged into the interior of the right skull.[30] McGlothen also suffered a stab wound in his left upper chest or shoulder area.[31]

Dr. Troxclair also testified that rigor mortis generally sets in between six and twelve hours after death and disappears after 24 to 36 hours.[32] Based on the elapsed time,

---

[28]Louisiana's circumstantial evidence rule, "is not a purely separate test from the <u>Jackson</u> standard to be applied instead of a sufficiency of the evidence test . . . . Ultimately, all evidence, both direct and circumstantial, must be sufficient under <u>Jackson</u> to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." <u>State v. Porretto</u>, 468 So. 2d 1142, 1146 (La. 1985); <u>accord</u> <u>State v. Williams</u>, 693 So. 2d 204, 208 (La. App. 4th Cir. 1997). The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury. If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." <u>State v. Maxie</u>, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); <u>accord</u> <u>State v. Williams</u>, 693 So. 2d at 208.

[29]St. Rec. Vol. 3 of 4, Trial Transcript, pp. 14-15, 1/29/07.

[30]<u>Id</u>., pp. 17-18, 19.

[31]<u>Id</u>., pp. 16-17.

[32]<u>Id</u>., p. 20.

rigor mortis is categorized as mild, moderate, severe or resolved.[33]  Rigor mortis had

already set in when McGlothen's body was discovered in the car.[34]  At the time the

autopsy was done at 10:00 a.m. on March 31, 2006, McGlothen's body still had moderate

rigor mortis.[35]

Nicole Gibson testified that at around 10:35 p.m. on March 29, 2006, she was in

the parking lot of her apartment complex waiting for a friend to arrive.[36]  While looking

for her friend's car, she approached a car stopped behind hers.[37]  She walked to the

passenger side and, when she realized it was the wrong car, she apologized.  The

passenger responded out of the half-opened window that it was alright.[38]  From this face-

to-face encounter, she was able to identify Nix from a photographic line-up.

Gibson also testified that, after she located her friend in the parking lot, they

headed back to her apartment walking past the same car.  She saw that the car's brake

lights were on, the passenger window was rolled up, and the passenger was no longer in

---

[33]Id., p. 21.

[34]Id., p. 22.

[35]Id., pp. 20, 21.

[36]Id., pp. 36-37.

[37]Id., p. 37.

[38]Id., pp. 37-38, 39.

the car.[39]  The car engine was not running and there was no music or sound coming from it.[40]

She also recalled that, when she walked her friend back down to the parking lot at around 1:00 a.m., the car was still in the same place, and her friend commented that she should go back inside because "that guy was still in the car."[41]  The next morning she returned to find her car still blocked in by the same car.[42]  She approached the driver and discovered McGlothen apparently dead in the front seat and yelled for her roommate and cousin to call 911.[43]

Archie Kaiser, McGlothen's roommate, testified that a few days prior to the murder, Nix rode back with Kaiser and McGlothen from New Iberia.[44]  He stayed at their apartment instead of going to his aunt's house.[45]  Kaiser's friend, Edward Turner from California, was also staying at the apartment.[46]  It turned out that Turner knew Nix.

---

[39]Id., p. 38.

[40]Id., p. 47.

[41]Id., p. 39, 47.

[42]Id., p. 40.

[43]Id., p. 41.

[44]Id., pp. 61-62.

[45]Id., p. 61.

[46]Id., pp. 68-69.

McGlothen and Nix developed a relationship.[47]  On March 29, 2006, Kaiser, McGlothen and Nix drove to New Iberia to pick up a paycheck for Nix.  When they returned to Terrytown at approximately 9:30 p.m., McGlothen and Nix left in McGlothen's car.[48]  Kaiser called and spoke to McGlothen at about 10:10 p.m., and he heard Nix in the background.[49]  When McGlothen did not return as expected, Kaiser called him again at about 10:42 p.m., and he did not answer.[50]  After that night, Nix never returned to the apartment to gather his belongings.[51]

Edward Turner, Kaiser's friend, testified that he grew up with Nix.[52]  Turner was with Kaiser and McGlothen when they went to New Iberia and returned with Nix.[53]  The day prior to McGlothen's murder, Nix and McGlothen had a disagreement.[54]  Nix told Turner that McGlothen had $10,000 in  his bank account.  Nix said that he had the personal identification number ("PIN") for the account and that he wanted to kill

---

[47]Id., p. 63.

[48]Id., pp. 63-64.

[49]Id., pp. 65-66.

[50]Id., p. 66.

[51]Id., p. 69.

[52]Id., p. 71.

[53]Id., p. 73.

[54]Id., pp. 72-73.

McGlothen for it. Nix asked Turner to be a part of it and Turner declined. Turner returned to California before the murder.

The record also shows that Nix was later arrested at his step-father's apartment where he was hiding under a bed.[55] Nix testified at trial that he was hiding under the bed because his girlfriend told his father that Nix's name was in the paper in connection with a murder.[56]

Nix testified that McGlothen loaned him a ring, which Nix gave to his cousin to whom he owed money for drugs.[57] After returning from New Iberia on March 29, McGlothen drove Nix to his cousin's apartment to get back the ring.[58] Nix went to his cousin's apartment and McGlothen stayed in the car.[59] He was not able to get the ring back because his cousin sold it.[60] Nix did not return to the car, because he knew

---

[55]Id., p. 95; St. Rec. Vol. 3 of 4, Trial Transcript, p. 57, 1/30/07.

[56]St. Rec. Vol. 3 of 4, Trial Transcript, p. 57, 1/30/07.

[57]Id., p. 55, 71.

[58]Id., pp. 54-55.

[59]Id., pp. 56, 74-75.

[60]Id., p. 56.

McGlothen would be upset.[61]  Instead, he left the apartment complex with his cousin and walked around.[62]

Nix told the jury that the last time he saw McGlothen, he was in good health sitting in his car in the parking lot.[63]  He denied killing McGlothen.[64]  He also denied having a conversation with or seeing Nicole Gibson.[65]  He affirmed that he never went back to McGlothen's apartment to gather his belongings, because he just stayed at his cousin's apartment after that night.[66]  Nix also testified that had known Edward Turner for a long time from a foster home and group homes.[67]  He denied telling Turner about McGlothen's bank account.[68]

The evidence, including Nix's testimony, places him in the car at the scene of the murder.  The medical evidence tended to establish that because McGlothen's body showed rigor mortis when it was discovered, he died at least 6 hours prior to its discovery.  Even by Nix's testimony, McGlothen was alive between 10:00 and 10:30

---

[61]Id., pp. 56, 75.

[62]Id., p. 75.

[63]Id., p. 55.

[64]Id., p. 56.

[65]Id., p. 75.

[66]Id., pp. 76-77.

[67]Id., p. 54-55.

[68]Id., p. 56.

p.m.  A reasonable juror could find that the murder had to have occurred around that same time for rigor mortis to have set in by the time of Gibson's discovery.

Thus, there was evidence from which a jury could reasonably approximate that the time of death was while Nix was on the scene.  Nix disappeared on the night of and around the same time McGlothen was last seen alive.  After learning that police wanted him for murder, he hid under a bed when they located the place where he was staying. The evidence also presented a motive, including statements he made to Turner about stealing McGlothen's money and killing him.

In the light most favorable to the prosecution, this evidence placing him at the scene of the crime in the car with McGlothen, though circumstantial, was sufficient for a reasonable jury to find him guilty of manslaughter.  The jury apparently did not believe Nix's testimony that he simply walked away from McGlothen's car that night and never returned.  Such a credibility choice was well-within the jury's decision-making sphere. Jackson, 443 U.S. at 319; Ramirez, 398 F.3d at 695 (resolution of credibility and conflicting inferences are resolved in favor of the verdict).

The state courts' denial of relief on Nix's claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Nix is not entitled to relief on this claim.

B.    Attempted Second Degree Murder of Jiminez

Nix argues that the evidence was insufficient to convict him of the attempted second degree murder of Jiminez.  He alleges that the State failed to prove that he had the specific intent to kill Jiminez.  He also suggests that the evidence does not support an attempted manslaughter verdict because there was no showing of sudden passion or heat of blood.  At best, he claims, the evidence demonstrated an aggravated battery.  Nix points to the lack of medical evidence to establish that Jiminez's injuries were severe enough to create an inference of an intent to kill or cause great bodily harm.

Nix was convicted of the attempted second degree murder of Jiminez.  This court need not consider whether the evidence was also sufficient to establish attempted manslaughter or aggravated battery.  Second degree murder is defined in relevant part by Louisiana law as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery, first degree robbery, second degree robbery, simple robbery . . . even though he has no intent to kill or to inflict great bodily harm."[69]  La. Rev. Stat. Ann. § 14:30.1(A)(1).  The "attempt" element is defined

---

[69]Under Louisiana law, it has long been resolved that, while intent to inflict great bodily harm is an element of second degree murder, it is not alone to be considered in obtaining a conviction for attempted second degree murder.  State v. Butler, 322 So.2d 189 (La. 1975); State v. Collins, __ So.3d __, 2010 WL 2571362, at *7 (La. App. 1st Cir. 2010) ("To be guilty of attempted second degree murder, a defendant must have the specific intent to kill and not merely the specific intent to inflict great bodily harm.")

by La. Rev. Stat. Ann. § 14:27 which provides in pertinent part that "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object."

The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. Ann. § 14:10(1). Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); State v. Tate, 851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)). Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun. State v. Collins, __ So.3d __, 2010 WL 2571362, at *7 (La. App. 1st Cir. 2010).

In this case, Jiminez testified that he owned his home on Brunswick Court in Algiers, Louisiana, where this incident occurred.[70] He was living there with Derrick Hatcher. Hatcher brought Nix home with him one day and wanted Nix to stay for a few days.[71] Jiminez declined at first and then agreed to let him stay the weekend.[72] He allowed Nix to stay in the FEMA trailer in the front yard. In the late afternoon of April

---

[70]St. Rec. Vol. 3 of 4, Trial Transcript, p. 17, 1/30/07.

[71]Id., pp. 18-19.

[72]Id., p. 19.

22, 2006, Nix drove Jiminez to a gas station to pick up Jiminez's car that had been repaired. Jiminez said he asked Nix to help him, because he needed to get to the gas station and have someone drive the other car.

After returning to the house, he allowed Nix to watch television in the house that evening.[73] Nix remained in the television room through the evening. At one point, Nix asked Jiminez if he could borrow $80 to take his girlfriend to a club on Claiborne Avenue after she got off of work.[74] Jiminez declined. He instead offered to give them a ride to the club. Nix told him that his girlfriend would come to the house around midnight.[75] Jiminez did some chores around the house and then told Nix he was going to lie down and to wake him when he was ready to go to the club.[76]

Jiminez went to sleep and did not know if the girlfriend ever arrived at the house.[77] He recalled that, after 11:30 p.m. or close to midnight, Nix entered the bedroom and called his name. The next thing he knew, he was being hit with a knife. He was stabbed just above his eyebrow and in the right upper arm, the right lower arm, the left chest just

---

[73]Id., p. 20.

[74]Id., p. 21.

[75]Id., pp. 21-22.

[76]Id., pp. 21, 22.

[77]Id., p. 22.

above the heart, and in the top of his chest. He rolled off of the bed away from Nix to get away from the knife blows. Nix demanded his money and his wallet or keys.[78]

Jiminez eventually threw the wallet, which had no money in it, out of the bedroom door into the living room. When Nix left the room to retrieve the wallet, Jiminez locked the bedroom door. Jiminez heard the front door open, so he peered out the bedroom window and saw Nix in the front yard. He went to the living room and locked the front door with the deadbolt. He went into the kitchen to call 911, but he may have mis-dialed because the dial was covered with his blood. He then went to Hatcher's room to try his cell phone.[79] In the confusion, he apparently dialed a friend instead of 911. Jiminez eventually did reach an operator to report the stabbing, but he was not sure if it was a 911 operator.

Jiminez then heard someone at the front door. Nix had let himself back into the house with a set of keys he took from Hatcher's room. Nix apparently tried to leave in Hatcher's car, but it had a dead battery.[80] He returned for the keys to Jiminez's truck. Jiminez refused to give up the keys.[81]

---

[78]Id., p. 23.

[79]Id., p. 24.

[80]Id., p. 25.

[81]Id., pp. 25-26.

Jiminez grabbed a table to use as a shield, because Nix was still wielding the knife at him.[82]  Jiminez kept pushing at Nix to get him out of the house.  Nix threw the knife and ran out.  Jiminez took chase armed with an umbrella and screamed for someone to call the police.  In addition to the cuts he received, Jiminez also suffered a broken collar bone.[83]

The State presented pictures of the house showing blood in Jiminez's bedroom, in the kitchen, in Hatcher's bedroom, and in the living room, including bloody blankets from Jiminez's bed and the bloody table.[84]  There also was a picture of the blood on the sidewalk, where he chased Nix down the street.  Jiminez also identified the picture of the knife from the FEMA trailer that Nix had in his hand when he returned to the house to get the truck keys.  Jiminez knew the knife was from the FEMA trailer, because he did not keep that kind of knife in the house.

The jury also heard Nix's testimony that he stayed with Jiminez and Hatcher.[85]  He stated, however, that he slept on the couch in the living room, not in the FEMA trailer.  He recalled that, on April 22, 2006, Jiminez returned to the house and told him

---

[82]Id., p. 26.

[83]Id., p. 33.

[84]Id., p. 30-31.

[85]Id., p. 48.

that Hatcher had been arrested.[86]  After walking around the house for a while, Jiminez sat on the loveseat next to Nix.[87]  Jiminez put his arm around Nix.  Nix told him to move his hand, and he did.  Nix testified that Jiminez put his arm back around him and then offered him money for sex.  Nix refused, and insisted that he did not have sex with men.[88]  Jiminez continued asking with higher monetary offers.  Nix continued to decline, and told him that he had a girlfriend.

Nix testified that Jiminez got angry and ordered him out of the house.  Nix refused to leave because he was paying $30 every two days to stay there.[89]  Nix stated that Jiminez got up, got a knife from the kitchen and charged at him.  Nix stated that he flipped the table over to stop Jiminez.  Nix pushed Jiminez back into the living room with the table and Jiminez dropped the knife.  Nix stated that he then picked up the knife and stabbed Jiminez in self-defense.

On cross-examination, Nix said that he picked up the knife after Jiminez dropped it.[90]  As he was heading out the door, he dropped the knife.  Jiminez then picked it up and

---

[86]Id., p. 49.

[87]Id., p. 50.

[88]Id., p. 51.

[89]Id., p. 52.

[90]Id., pp. 65-67.

cut Nix on the hand.[91]  Nix wrestled with him and hit him in the groin to get Jiminez to

drop the knife again.[92]  Nix then ran out of the house.

Based on the verdict, the jury found credible the evidence before it demonstrating

that, when awakened from sleep, Nix stabbed Jiminez multiple times with a knife in the

chest and in the face or head, while intending to steal from Jiminez.  Jiminez's injuries

were severe enough to cause a broken bone and profuse bleeding, which warranted

emergency medical care.  Jiminez was also scarred in the attack.

This evidence was sufficient for the jury to conclude that Nix acted with specific

intent and to support the verdict of attempted second degree murder.  The state courts'

denial of relief on Nix's claim was not contrary to, or an unreasonable application of,

Supreme Court precedent.  Nix is not entitled to relief on this claim.

## VII.   ADMISSION OF PHOTOGRAPHS (CLAIM NO. 4)

Nix alleges that the state trial court erred in admitting pictures of McGlothen after

death and while the knife was still lodged in his left eye.  He argues that the pictures were

gruesome and used solely to inflame the jury.  These arguments were asserted on direct

appeal in the Louisiana Fourth Circuit and were denied as meritless.  The court resolved

that the photographs were "somewhat disturbing" but were not so gruesome as to have

improperly influenced the jury's verdict.

---

[91]Id., p. 65.

[92]Id., pp. 65-66.

As an initial matter, federal habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir.1992). The states are free to implement procedures regarding the admission of evidence, provided those procedures do not infringe on a constitutional guarantee. Burgett v. Texas, 389 U.S. 109 (1967).  Therefore, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair.  Lisenba, 314 U.S. at 236-37; Peters, 942 F.2d at 940 (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.)  "Federal habeas corpus relief may be granted on erroneous state evidentiary rulings only if the challenged evidence is a crucial, critical, or highly significant factor in the context of the entire trial." Thomas v. Lynaugh, 812 F.2d 225, 230-231 (5th Cir.1987) (citations omitted).

This issue presents a mixed question of law and fact.  Dickson v. Sullivan, 849 F.2d 403, 405-06 (9th Cir. 1988). Under the applicable standard of review, this court therefore must determine if the state court's decision is contrary to or involved an unreasonable application of Supreme Court precedent prohibiting an unfair trial.

The record does not demonstrate undue prejudice arising from the admission of the pictures containing views of the McGlothen's body.[93] The State first introduced post mortem pictures of McGlothen in connection with the testimony of Dr. Troxclair concerning the rigor mortis condition of the body at the time it was discovered.[94] One picture showed McGlothen seated in the car, with his head tilted to the left.[95] The second photograph showed McGlothen being placed in the body bag, with his head and arms in the same position as they were in the car.[96] Defense counsel had no objection to these photographs at the time. He also relied on these same pictures to point out that McGlothen's body was not still in a seated position as it had been in the car and that the doctor had only assumed that the body was straightened to be placed into the bag.[97]

The State also presented pictures during Nicole Gibson's testimony, including one taken from her apartment balcony of the car with McGlothen's body in it.[98] She identified another photograph taken of McGlothen seated in the car with the knife in his

---

[93]The relevant photographs marked as State's Exhibits 3, 4, and 7 through 19, used by the State were taken by Bessie Johnson from the crime laboratory. Id., p. 81.

[94]St. Rec. Vol. 3 of 4, Trial Transcript, p. 22, 1/29/07.

[95]Id., State's Exhibit 3.

[96]Id., State's Exhibit 4.

[97]Id., p. 27.

[98]Id., p. 37, State's Exhibit 10.

eye depicting what she saw when she discovered the body.[99]  Defense counsel did not object to the admissibility of either of these photographs.[100]

The State also referenced several photographs of the scene and the victim during the testimony of Officer Frederick Carter, who answered the call to the scene.[101]  When the State sought to introduce the photographs after his testimony, defense counsel objected to two of them, Exhibits 15 and 18, on grounds that they were cumulative and inflammatory.[102]  The record does not indicate exactly what was shown in these two photographs.  The defense's objection was overruled.  The same photographs were discussed again with Detective Barrick Morton, the lead detective on the case.[103]  No additional objections were lodged at that time.

At the close of the defense case, the State re-offered the previously admitted photographs related to the McGlothen murder, including those referenced above.[104]  Although he had no objection on the previous day, defense counsel objected to the

---

[99]Id., p. 40, State's Exhibit 13.

[100]Id., pp. 55-56.

[101]Id., p. 54, State's Exhibits 3, 4, 7-9, 10-13 and 15-19.

[102]Id., pp. 55-56.  The record does not provide a specific description of either of the two photographs.

[103]Id., p. 85.

[104]Id., pp. 40, State Exhibits 3, 4, and 7-19.

photograph of McGlothen in the car as cumulative and inflammatory.[105]  The objection was overruled after the court realized that the photographs had already been marked and published to the jury the day before.[106]  The same was true of the remaining photographs, which were State's Exhibits 7 through 19, which had already been admitted.[107]

Contrary to Nix's suggestion, the trial record does <u>not</u> establish that the pictures were of such a gruesome nature that prejudice outweighed their probative value.  The pictures were used both by the State and the defense to address relevant issues related to the time and cause of death and intent, all relevant to the murder.

Nix notes that the state trial court acknowledged the "horrific nature" of the photographs.  While this is true, the comment occurred at the sentencing hearing not at trial.  In addition, the state trial court further explained that probative value was the reason the photographs were admitted.  During the victim impact testimony at the sentencing hearing, the following exchange took place between the state trial judge and Lee Wings, who was McGlothen's brother:

THE COURT:
    Was his casket able to be opened or closed?

THE WITNESS:
    It was open.

---

[105]<u>Id</u>., State's Exhibit 3.

[106]<u>Id</u>., pp. 40-41.

[107]<u>Id</u>., p. 42.

THE COURT:

     It was actually opened.

THE WITNESS:

     Yes.

THE COURT:

     I only ask that because of the nature of the wounds as displayed on the – – on the body.

THE WITNESS:

     They did a good job with it, the undertakers, but – –

THE COURT:

     Well, I commend whoever it was who was responsible for the preparation of this gentleman's remains, because clearly his face was greatly disfigured and greatly dishonored by the wounds that were inflicted.

     There was an objection, as there should have been, to preserve the record on behalf of the defendant as to the admission of the photographs. I thought that the photographs, although somewhat horrific, the mere fact they were of that nature does not mean they are not admissible, and the Court deemed that they were admissible, finding that their probative value outweighed any prejudicial effect to a significant degree, and thus that was ruled upon in favor of the State and those photographs admitted.

     We await the arrival of any opinion from the Louisiana Fourth Circuit Court of Appeal as it relates to that and any other issues that may be raised on appeal.

     But that is something that I have been thinking about since this case was decided, and those pictures were reviewed by this Court, as to whether or not this gentleman was even afforded the opportunity to have his family view his remains in a dignified manner before their final goodbyes, and I am happy to learn that that was the case. Please continue.

The court's comments were directed at sympathizing with the family during victim impact testimony at sentencing and were not meant as part of its prior ruling. Nevertheless, due process does not require that the pictures be something other than graphic to be admitted. The record is clear that some of the pictures showed McGlothen

with the knife in his eye.  That alone, however, was not enough to exclude the pictures or to establish undue prejudice at trial.

As properly determined by the state trial court, the pictures were probative of issues that had to be considered by the jury.  The pictures were not wrongfully admitted at trial, nor did they render the trial fundamentally unfair.  The state courts' denial of relief on Nix's claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Nix is not entitled to relief on this claim.

VIII.   EXCESSIVE SENTENCE (CLAIM NO. 5)

Nix alleges that the he should not have received the maximum sentence based on certain mitigating circumstances.  He suggests that both of the victims were sexual predators who preyed on young, homeless, unsettled men without families.  He also refers the court to his personal history in the presentence report.  He complains that the state trial judge focused instead on the negative points of his background, i.e. his three children by three different women, to impose the maximum sentences to be served consecutively.

These arguments were asserted on direct appeal in the Louisiana Fourth Circuit and were denied as meritless.  The court found that there was no evidence that either victim was a sexual predator and that there was evidence that Nix had family in the area, although both victims allowed him to stay at their homes temporarily.  The court also found that the maximum sentence had been approved by Louisiana appellate courts for

both crimes. The court determined that the trial court properly considered the pretrial report, the victim impact testimony, the violent nature of the crimes, and the trial evidence before imposing the maximum sentences. The court resolved that neither sentence was excessive under the circumstances of the case.

Federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits. Haynes v. Butler, 825 F.2d 921, 923-24 (5th Cir. 1987); Turner v. Cain, 199 F.3d 437 (5th Cir. 1999) (unpublished) (sentence was within Louisiana statutory limits and within trial court's discretion, therefore petitioner failed to state cognizable habeas claim for excessive sentence). If a sentence is within the statutory limits, a federal habeas court will not upset the terms of the sentence unless it is grossly disproportionate to the gravity of the offense. Harmelin v. Michigan, 501 U.S. 957 (1991); Solem v. Helm, 463 U.S. 277 (1983).

"[W]hen a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,'" a court then considers (a) the sentences imposed on other criminals in the same jurisdiction; and (b) the sentences imposed for commission of the same offense in other jurisdictions. Smallwood v. Johnson, 73 F.3d 1343, 1346-47 (5th Cir. 1996); McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992). As mentioned above, the Louisiana Fourth Circuit made this same comparison in considering Nix's sentence.

Nix's sentences for both manslaughter and attempted second degree murder were within the statutory ranges in place in Louisiana at the time of the crimes. Louisiana law provided that a person convicted of manslaughter shall be imprisoned at hard labor for not more than forty years. La. Rev. Stat. Ann. § 14:31 (West 2003). Because second degree murder carries a mandatory life sentence,[108] a person convicted of attempted second degree murder shall be imprisoned by no less than 10 years nor more than 50 years, without benefit of parole, probation or suspension of sentence. La. Rev. Stat. Ann. § 14:27(D)(1)(a).[109]

Because Nix's sentences were within the statutory parameters, this federal court must consider proportionality when compared with sentences imposed in similar cases. The United States Supreme Court has stated that "'[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.'" Ewing v. California, 538 U.S. 11, 23 (2003) (quoting Harmelin, 501 U.S. at 1001 (Kennedy J., concurring in part and concurring in judgment)). The Supreme Court has recognized that only the rare case will reach the level of gross disproportionality. Id., 538 U.S. at 30 (quoting Harmelin,

---

[108]La. Rev. Stat. Ann. § 14:30.1(B).

[109]On June 24, 2010, the statute was amended by Acts 2010, No. 531 to amend the penalties for attempted theft crimes.

501 U.S. at 1005). As noted above, that disproportionality is judged by whether similar sentences have been imposed for the same offense. Smallwood, 73 F.3d at 1346-47.

With respect to the manslaughter conviction, the record and the evidence, as determined by the state courts, established that Nix and McGlothen had a dispute over a ring loaned to Nix. The evidence was sufficient to establish that, while on an errand to retrieve the ring, Nix used significant force to thrust a knife into McGlothen's eye. The appellate court resolved that these facts, together with Nix's criminal history, were sufficient to warrant imposition of the maximum sentence under Louisiana's sentencing provision.

Louisiana courts at the time consistently imposed the maximum 40-year prison sentence in similar cases of manslaughter. See e.g., State v. Johnson, 878 So.2d 869 (La. App. 2d Cir. 2004) (40 years after defendant convicted of lesser offense of manslaughter on second degree murder charge for killing ex-girlfriend after ongoing dispute after their breakup); State v. Williams, 875 So.2d 1043 (La. App. 3rd Cir. 2004) (40 years after defendant convicted of manslaughter on a second degree murder charge arising from confrontation after ongoing dispute with victim); State v. Douglas, 914 So.2d 608 (La. App. 2d Cir. 2005) (40 years after defendant plead guilty to manslaughter on second degree murder charge after chasing drug purchaser down for failure to pay for cocaine); State v. Bell, 854 So.2d 429 (La. App. 4th Cir. 2003) (40 years for manslaughter in killing of defendant's lover after a quarrel). Nothing Nix has presented distinguishes his

situation from the decisions cited above in which the maximum 40-year prison sentence was imposed.

With regard to the attempted second degree murder sentence, the record and the evidence, as determined by the state courts, established that after Jiminez refused to give Nix money, Nix attacked Jiminez while he slept, without provocation[110] and with a knife, repeatedly stabbing him in the head, chest and arm, before demanding money and car keys. The appellate court resolved that these facts, together with Nix's criminal history, were sufficient to warrant imposition of the maximum sentence under Louisiana's sentencing provision.

Louisiana courts at the time consistently imposed the maximum 40-year prison sentence in similar cases of attempted second degree murder. See e.g., State v. Zaldivas, 836 So.2d 577 (La. App. 5th Cir. 2002) (50-year sentence affirmed following conviction where victim had allowed defendant to temporarily stay in his apartment, then asked defendant to move out, and defendant re-entered the apartment through a window, attacked the victim, cut the victim's throat with a razor knife, and continued to slash and cut the victim; after forcing defendant out of the house, the victim called 911 and ran outside to get help; victim bled profusely and suffered severe scarring from the knife wounds); see also, State v. Harris, 924 So.2d 1184 (La. App. 3d Cir. 2006) (50-year

---

[110]State v. Nix, 987 So.2d at 869; St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 2007-KA-1431, p. 25, 6/18/08.

sentence affirmed where defendant repeatedly beat his neighbor with a hammer and the attack was unprovoked); <u>State v. Taylor</u>, 841 So. 2d 894 (La. App. 5th Cir. 2003) (50-year sentence affirmed where defendant, who was found competent to stand trial and whom the victim had known for years, broke into the bedroom where the victim was sleeping, jumped on her, put a knife to her throat, and demanded her purse); <u>State v. Camese</u>, 791 So.2d 173 (La. App. 4th Cir. 2001) (50-year sentence affirmed despite the fact defendant had no prior criminal record and shooting was unprovoked after defendant demanding victim's car). Nothing Nix has presented distinguishes his situation from the decisions cited above in which the maximum 50-year prison sentence was imposed.

Furthermore, the fact that the sentences are to run consecutively does not render them excessive. First, the question of whether sentences are to run concurrently or consecutively is a matter of state law, and violation of state law is not for habeas corpus review. <u>Bergeron v. Sigler</u>, 241 F.2d 412, 412 n.1 (5th Cir. 1957); <u>Benoit v. Cain</u>, No. 07-0039, 2009 WL 4572903, at *21 (W.D. La. Dec. 4, 2009). I note, nevertheless, that Louisiana law concerning consecutive sentences is found in La. Code Crim. P. art. 883, which provides as follows:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.

Nix concedes in his argument regarding the severance issue that the two incidents, the McGlothen murder and the Jiminez attempted murder, were not of the same transaction. Consequently, under Louisiana law, the preference is for the sentences to run consecutively.

Furthermore, under the Eighth Amendment standard, imposition of consecutive, as opposed to concurrent sentences, does not constitute an unconstitutionally excessive sentence. As discussed above, Nix has not established that the punishment imposed upon him was grossly disproportionate to the crimes he committed as required to establish an Eighth Amendment violation. Ewing, 538 U.S. at 11; Solem, 463 U.S. at 277. He was convicted of two separate crimes of violence involving men who provided him with a place to live and other amenities and both crimes involved brutal knife attacks. As resolved by the state appellate court, there is no credible evidence in the record to indicate that either victim was a sexual predator. There also was no evidence that Nix was either homeless or without family; on the contrary, Nix had several family members in close vicinity and with whom he eventually did stay.

Considering this record, Nix has not shown that his sentences were grossly disproportionate to the crimes of conviction or that the fact that they were imposed consecutively violates the Eighth Amendment. Accord, Smith v. Cain, No. 07-1504, 2007 WL 2461663, at *8 (E.D. La. Aug. 23, 2007) (Order adopting Report) ("However, petitioner cites no authority for the proposition that the imposition of consecutive

sentences under such egregious facts is impermissible under the United States Constitution and this Court, in its independent research, has located no such authority. Accordingly, the Court finds that petitioner has not met his burden of proof with respect to this claim.").  For the reasons discussed above, the state courts' finding that Nix's sentences for manslaughter and attempted second degree murder were not excessive was not contrary to established Supreme Court case law, nor was it an unreasonable application of Supreme Court precedent.  Nix is not entitled to relief on this claim.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Louis Nix for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

_United Servs. Auto. Ass'n_, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[111]

New Orleans, Louisiana, this ____20th____ day of September, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[111]_Douglass_ referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.